**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| MOLL INDUSTRIES, INC., *et al.,* [1] | ) | Case No. 10-11371 (____) |
| | ) | |
| Debtors. | ) | Joint Administration Pending |

**DECLARATION OF JEFFREY C. MERRITT IN SUPPORT**
**OF FIRST DAY MOTIONS AND APPLICATIONS**

Jeffrey C. Merritt, being duly sworn, deposes and states as follows:

1.      I am the Chief Restructuring Officer of Moll Industries, Inc. ("Moll Industries"),

(a) a corporation organized under the laws of the state of Delaware, (b) one of the above-

captioned debtors and debtors in possession (collectively, the "Debtors" or the "Moll

Companies") and (c) the direct or indirect parent or subsidiary of each of the Debtors.  I submit

this Declaration in support of the Debtors' chapter 11 filings and the First Day Pleadings.  Any

capitalized terms not expressly defined herein have the meanings given to them in the applicable

First Day Pleading.  Except as otherwise indicated, all statements in the Declaration are based on

my personal knowledge, my review of relevant documents or my opinion based upon my

experience and knowledge of the Debtors' operations and financial condition.  If I were called

upon to testify, I could and would testify to each of the facts set forth herein based on such

personal knowledge, review of documents or opinion.  I am authorized to submit this Declaration

on behalf of the Debtors.

2.      On April 27, 2010 (the "Petition Date"), each of the Debtors commenced a

chapter 11 bankruptcy case (the "Chapter 11 Cases") by filing a voluntary petition for relief

---

[1] The Debtors are the following entities:  Moll Industries, Inc.; Moll Holdings, Inc.; Moll Europe
Holdings, LLC; and Moll Latin America Holdings, LLC.

under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware.

3. To enable the Debtors to minimize any adverse effect of the commencement of the Chapter 11 Cases on their businesses, as well as preserve the value of their businesses to enable them to market and sell their business operations as a going concern, the Debtors are requesting various types of relief in certain "first day" applications and motions (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief, among other things, to: (a) obtain access to cash collateral to fund the operation of the Debtors' businesses; (b) preserve customer, vendor and supplier relationships; (c) maintain employee confidence and morale; (d) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; and (e) establish certain other administrative procedures to promote a smooth transition to chapter 11. Building and maintaining the support of the Debtors' customers, employees, vendors, service providers and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be crucial to the Debtors' efforts to maximize the value of their estates for the benefit of all stakeholders.

4. The Debtors commenced these Chapter 11 cases after a thorough examination of their various restructuring alternatives. As part of this process, as described in greater detail below, the Debtors have engaged in extensive discussions with their prepetition secured lender group (collectively, the "Pre-Petition Secured Lenders") and determined that a sale of the Debtors' business operations as a going concern will provide the best opportunity to maximize the value of the Debtors' assets.

5. Part I of this Declaration describes the Debtors' businesses, corporate structure, capital structure and the circumstances giving rise to the commencement of the Chapter 11

Cases. Part II of this Declaration sets forth relevant facts in support of certain of the First Day Pleadings.

# I.  BACKGROUND

## A.  The Moll Companies' Businesses

6.     The Debtors are a significant provider of global injection molding and full-service contract manufacturing solutions for the medical, appliance, industrial, consumer and automotive markets.  They are also specialists in drug delivery, surgical devices, enclosures and fluid delivery products, and are considered one of the most experienced full-service contract manufacturer of custom injection molded components and assemblies to the appliance industry in North America. They have registered medical device establishment with the FDA in their manufacturing facilities in Seagrove, North Carolina and Donegal, Ireland.[2]

7.     Moll Industries was formed in 1998 through the merger (the "Merger") of two leading plastics injection molders, Moll PlastiCrafters Limited Partnership ("Moll L.P.") and Anchor Advanced Products, Inc. ("Anchor Advanced"), which were each controlled by Mr. George T. Votis.  Immediately prior to the Merger, Moll L.P. and Anchor Advanced were independently operated entities.  Anchor Advanced survived the Merger and changed its name to "Moll Industries, Inc.").

8.     Moll Industries's operating results were lower than expected following the Merger.  The Debtor experienced financial difficulties relating to certain operations in Europe, resulting in a restructuring of its European operations, including shutting down or disposing of certain facilities in the United Kingdom and France.  Moll also sold certain other businesses, closed certain other facilities and took other actions in response to its low operating results in the

---

[2] The Donegal, Ireland facility is owned by a non-debtor affiliate, Moll Industries Ireland LTD

1999 to 2002 timeframe, but continued to experience significant liquidity problems despite these actions that prevented it to make payments to its creditors. Attempts to refinance its senior credit facility were unsuccessful.

9.      By June, 2002, Moll faced a liquidity crisis related to scheduled interest payments on certain subordinated notes, which at the time appeared to be the only viable financing option.

10.      On September 6, 2002, creditors filed an involuntary petition of bankruptcy under Chapter 11 of the Bankruptcy Code against Moll in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Case no. 02-54341 (RBK) (the "Prior Bankruptcy Proceeding"). On September 17, 2009, the Prior Bankruptcy Proceeding was converted to a voluntary proceeding under Chapter 11 of the Bankruptcy Code.

11.      On June 5, 2003, Moll emerged from the Prior Bankruptcy Proceeding. The Moll Companies' current corporate structure, as described below, is the result of the reorganization process from that proceeding.

12.      The Debtors presently maintain their corporate headquarters in Dallas, Texas and operate a manufacturing facility in Seagrove, North Carolina. Debtors' workforce currently consists of approximately 125 employees.

13.      For the year ended December 31, 2009, the Moll Companies generated revenue of approximately $22.2 million. As of April 27, 2010, the Moll Companies had approximately $16 million in assets and approximately $74 million in liabilities on a consolidated basis.

**B.      Product Categories**

14.      Among others, the Moll Companies manufacture, sell and distribute the following primary types of products:

### *Medical Device Components and Assemblies*

15.     The Moll Companies are specialists in the manufacture of drug delivery, surgical devices, enclosures, fluid delivery products and other medical products (collectively, the "Medical Products"). The Moll Companies sell certain of their Medical Products to medical device manufacturers. During 2009, the Moll Companies sold more than $16 million worth of Medical Products, accounting for approximately 74 percent of the Moll Companies' total annual revenue.

### *Appliance Components and Assemblies*

16.     The Moll Companies are among the most experienced full-service contract manufacturers of custom molded components and assemblies, including egg containers, crisper drawers, washing machine lids, washing machine agitators, in-door ice machines, ice & water dispensers, appliance handles, fridge door panels, meat pans, temperature control units, fridge casings, temperature control units, and other appliance products (collectively, the "Appliance Products"). Appliance Products are sold to the appliance industry in North America. During 2009, the Moll Companies sold more than $787,000 worth of Appliance Products, accounting for less than one percent of the Moll Companies' total annual revenue.

### *Consumer Products*

17.     The Moll Companies have an extensive history manufacturing consumer products, such as mugs, coolers, blender parts, copier machine parts, sprinkler system control boxes, smoke alarms, thermostat boxes, housing vents, lazy susans, combs, industrial chains, vent covers, battery casings, fiber-optic cable bobbins, garage door remote controls, garage door opener covers, and other consumer products (collectively, "Consumer Products"). The Moll Companies sell certain of their Consumer Products to consumer products manufactures. During

2009, the Moll Companies sold more than $5.4 million worth of Consumer Products, accounting for approximately 25 percent of the Moll Companies' total annual revenue.

### C.     Corporate Structure

18.     Debtor Moll Holdings, Inc., a Delaware corporation, is the sole shareholder of debtor Moll, and the sole member of both Moll Europe Holdings, LLC, and Moll Latin America Holdings, LLC, each a Delaware limited liability company. A chart showing the Debtors' corporate structure is attached to this Declaration as Exhibit A.

### D.     Pre-Petition Capital Structure

19.     In connection with its emergence from its 2003 Bankruptcy, the Senior Lenders made certain loans and advancements to debtor Moll Industries pursuant to that certain Amended and Restated Loan and Security Agreement dated as of December 31, 2004 by and among Moll Industries, Inc, as Borrowers, the Lenders that are signatories hereto (the "Senior Lenders") and Heritage Bank, SSB, as the Administrative Agent (the "Senior Agent"),[3] as the same may have been amended from time to time thorough the Petition Date (the "Senior Credit Agreement"). All such loans, financial accommodations and other amounts owing by the Debtors to the Senior Agent and the Senior Lenders under, or in connection with, the Senior Credit Agreement and the other collateral and ancillary documentation executed in connection therewith (as amended, supplemented or otherwise modified, the "Senior Loan Documents") are hereinafter referred to as the "Senior Pre-Petition Obligations". The Senior Credit Agreement matured on December 31, 2009 and the Senior Pre-Petition Obligations became due and owing on that date.

20.     Also in connection with its emergence from the 2003 bankruptcy, the Subordinated Lenders made certain loans and advancements to Moll Industries pursuant to that

certain Amended and Restated Senior Subordinated Secured Note and Security Agreement dated as of December 31, 2004 by and among Moll Industries, Inc, as Borrowers, the Lenders that are signatories hereto (the "Subordinated Lenders") and Heritage Bank, SSB, as the Administrative Agent (the "Subordinated Agent"), as the same may have been amended from time to time thorough the Petition Date (the "Subordinated Note"). All such loans, financial accommodations and other amounts owing by the Debtors to the Subordinated Agent and the Subordinated Lenders under, or in connection with, the Subordinated Note and the other collateral and ancillary documentation executed in connection therewith (as amended, supplemented or otherwise modified, the "Subordinated Note Documents") are hereinafter referred to as the "Subordinated Pre-Petition Obligations". The Subordinated Note matured March 10, 2010 and the Senior Pre-Petition Obligations became due and owing on that date.

21.     The remaining Debtors executed individual guarantees and security agreements with respect to both the Senior Credit Agreement (collectively, the "Senior Guarantees") and Subordinated Note (collectively, the "Subordinated Guarantees").

22.     As of the Petition Date, the Senior Pre-Petition Obligations totaled approximately $57,714,652.01, exclusive of interest, attorneys fees, costs, expenses or other charges and the Subordinated Pre-Petition Obligations totaled approximately $6,617,258.94, exclusive of interest, attorneys fees, costs, expenses or other charges. The Senior Pre-Petition Obligations and the Subordinated Pre-Petition Obligations (collectively, the "Indebtedness") are secured by liens on and security interests in substantially all of the Debtors' assets. Pursuant to an Intercreditor and Subordination Agreement between the Senior Lenders and the Subordinated Lenders

---

[3] Heritage Bank, SSB has since changed its name to NexBank, SSB. Thus, all references herein to the "Senior Agent" and "Subordinate Agent" are to NexBank.

(collectively, the "Lenders"), the liens and security interests of the Subordinated Lenders are subordinated to the liens and security interests of the Senior Lenders.

23.    In addition, the Debtors have unsecured debt obligations in the amount of approximately $2,200,000.

**E.    <u>Events Leading to Bankruptcy</u>**

24.    From 2004 through 2006 Moll operated as significant provider of global injection molding and full-service contract manufacturing solutions in the industrial, appliance and medical markets.  Through 2006, 60% of the Company's sales were generated from Whirlpool, a large appliance business.  This business relationship was terminated over pricing, and operations at the facilities located at Ft. Smith, Nashville and New Braunfels were exited in early fiscal 2007.

25.    As result of these occurrences, annual sales decreased from approximately $164 million to less than $60 million during this period.  Moll divested its Ramos and Empalme, Mexico operations in early fiscal 2009 in response to customer pricing concerns.  After exiting the Whirlpool relationship from 2005 through 2009, with the exception of fiscal 2007, Moll lost money each year.

26.    By the beginning of 2010 the losses and subsequent negative cash flow generated over the past five years drained the company of liquidity.  Trade debt was stretched and a number of legacy costs accumulated which the company didn't have the financial ability to fund.  In February, 2010, the company sold its Lexington, Kentucky plant and gave one of its largest customers, MEDRAD, Inc. an early payment discount that provided $1.3 million in needed liquidity that has allowed the company to fund ongoing operations in the short term.

27. Moll is currently projecting to generate EBITDA of $500,000 off of $16 million in sales for fiscal 2010. Also as a result of past liquidity problems, the company has taken customer deposits to have customer tooling made that was instead used to fund operations. There is still a $484,500 liability for tooling payments to complete those tools over the next several months.

28. There are also a number of large liabilities stemming from divested operations the company cannot fund. A judgment obtained by Invensys Controls ("Invensys") for $947,000, legal costs attributable to it and other legal battles of $425,000 and an under-funded pension liability of 3.5 million. The company's main problem forcing it into bankruptcy is that Invensys has been successful in requesting the sheriff to lock up and post for sale certain production equipment locates at the Seagrove facility. Moll will not be able to service its customers without the equipment and the company does not currently have the financial ability to pay the judgment amount, although attempts have been made to settle.

29. Based on the above described events, the Debtors have determined that it is in the best interest of the Debtors, their estates and their creditors to seek chapter 11 protection in order to, among other things, (i) stay the pending sheriff's sale pending a sale of the Debtors' assets and (ii) utilize the protections afforded to purchasers under Section 363 of the Bankruptcy Code to maximize the value of the Debtors' assets through the sale process.

**F.      Summary of First Day Pleadings**

### Motion of Debtors for Order Directing Joint Administration of Cases Pursuant To Bankruptcy Rule 1015 And Local Rule 1015-1.

30. The Debtors seek the joint administration of their chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules. Joint administration will ease the administrative burden for this Court and parties in interest and will obviate the need for

duplicative notices, motions, applications, and orders and thereby save considerable time and expense for the Debtors and their estates.

31.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases, and in fact, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. The Court will also be relieved of the burden of entering duplicative orders and maintaining redundant files. Finally, supervision of the administration aspects of these chapter 11 cases by the Office of the United States Trustee for the District of Delaware will be simplified.

32.     Accordingly, I believe that joint administration of the Debtors' chapter 11 cases is in the best interest of the Debtors, their estates, and all parties at interest, and should be granted in all respects.

**Application of Debtors Pursuant To 28 U.S.C. § 156(C) and
Del. Bankr. L.R. 2002-1(F) For Authorization to Retain and Appoint
Delaware Claims Agency LLC As Claims, Noticing and Balloting Agent.**

33.     The Debtors request, pursuant to 28 U.S.C. §156(c) and Local Rule 2002-1(f), authorization to (i) employ Delaware Claims Agency LLC ("DCA") as claims, noticing and balloting agent for the Debtors and (ii) to appoint DCA as agent for the Bankruptcy Court.

34.     Local Rule 2002-1(f) requires, in all cases with more than 200 creditors, that the debtor file a motion to retain a noticing agent on the first day of the case or within ten (10) days thereafter.  Del. Bankr. L.R. 2002-1(f).

35.     DCA is a data processing firm that specializes in Chapter 11 administration and related tasks, including noticing, claims processing, voting and other administrative tasks.  DCA also specializes in, and has expertise in, serving as outside Claims and Notice Agent to the United States Bankruptcy Court with respect to all aspects of claims administration, including docketing and storage of claims, maintenance of claims registers, and related noticing services.

36.     Given that there are well over 200 creditors and parties in interest in this case, retention of a claims agent is necessary and appropriate.  Retention of DCA will relieve the Clerk's Office of the burden of noticing, receiving, docketing and maintaining various pleadings in this case and ensure that proper notice is given to all parties.  Moreover, I understand that because the Debtors have more than 200 creditors, the retention of a claims agent is required by the Local Bankruptcy Rules.

37.     Accordingly, I believe the retention and appointment of DCA in connection with the administration of these cases is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**Debtors' Motion for Order Authorizing Debtors to (A) Continue
and Maintain Consolidated Cash Management System and Existing
Bank Accounts; (B) Continue Use Of Existing Business Forms;
And (C) Granting Interim and Final Waiver of Section 345 Requirements.**

### The Debtor's Cash Management System

38.     The Debtors' cash management system consists of eight separate bank accounts
(the "Bank Accounts") with four different banks. The Debtors' primary accounts are an accounts
receivable depository account (the "Depository Account") and an operating account (the
"Operating Account"), both with Wells Fargo Bank.  All accounts receivable are deposited in the
Depository Account and the funds are swept daily into the Operating Account.  Funds then are
swept as needed into five controlled accounts: one for health claims, one for the payment of
accounts receivable, one for a local checking account for the Seagrove, North Carolina, facility,
and two manual payroll check accounts.  The Debtors are no longer using the manual payroll
accounts and will be closing them in the near future as soon as all checks written on the accounts
clear.

39.     The Debtors also have a money market account with NexBank, SSB.  Excess cash
from the operating account is manually transferred to this money market account from time to
time.

40.     The Bank Accounts do not contain funds of any non-debtor entities and no funds
from the Bank Accounts are used to fund the operations of non-debtor affiliates other than
through documented inter-company loans.

### Relief Requested

41.     The Debtors request a waiver of the requirement that new bank accounts be
opened to replace all of the Bank Accounts because such a requirement would unnecessarily
disrupt their businesses and would not provide any significant benefit to the Debtors' estates,

their creditors or other parties in interest. The Debtors' ability to continue and maintain the Cash Management System and Bank Accounts is important to the efficient administration of the Debtors' estates and is necessary to prevent inordinate disruption to the Debtors' operations.

42.     The Debtors also seek authority to continue to use their current payroll and operating checks, existing stationery and business forms (the "Business Forms") during the pendency of these Chapter 11 cases. The Debtors' ability to us the Business Forms without alteration or change will prevent inordinate and unnecessary disruption and expense and, thus, is in the best interests of the Debtors' estates and creditors. The Debtors also seek a waiver of the requirement that the legend "debtor-in-possession" be imprinted on any existing Business Forms, including checks, and request that their banks be permitted to honor pre-petition checks as they are presented consistent with other orders of this Court.

43.     In conjunction with the maintenance of the Debtors' Cash Management System and Bank Accounts, and pursuant to section 345(a) of the Bankruptcy Code, the Debtors seek approval for a waiver of the investment and bonding requirements of section 345(b) of the Bankruptcy Code, first on an interim basis, and after a final hearing on a final basis. The Debtors seek this authorization to insure the orderly entry into bankruptcy and to help efficiently administer their businesses and avoid the disruptions and distractions that may divert the Debtors' attention from urgent matters during the initial stages of these Chapter 11 cases.

44.     The Debtors will continue to maintain records respecting all transfers among the Bank Accounts so that all transactions can be tracked and monitored after they have occurred. The Debtors will instruct their banks to add the designation "Debtor-in-Possession" or "DIP" to all checks ordered in the future, will treat the Bank Accounts for all purposes as accounts of the

Debtors as debtors-in-possession, and will maintain records that recognize the distinction between post-petition and pre-petition activities.

45.     For the foregoing reasons, I believe that the request regarding the continuance and maintenance of the cash management system and existing bank accounts, use of existing Business Forms and granting of the waiver of 345 requirements in the cash management motion is in the best interests of the Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of these cases and the Debtors' reorganization efforts.

**Motion Of The Debtors For Order Pursuant To Sections 105, 361, 362, 363, 364, 1107 And 1108 Of The Bankruptcy Code Authorizing Debtors To (I) Maintain Existing Insurance Policies And Pay All Policy Premiums Arising Thereunder Or In Connection Therewith and (II) Continue Insurance Premium Financing Programs and Pay Insurance Premium Financing Obligations Arising Thereunder or In Connection Therewith**

46.     The Debtors request, pursuant to sections 105, 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code, authorization to (i) maintain existing insurance policies and pay all policy premiums and (ii) continue insurance premium financing programs and pay insurance premium financing obligations.

47.     In the ordinary course of business, the Debtors maintain in current effect numerous insurance policies providing coverage for, among other things, general liability, automotive liability, commercial umbrella and excess liability, and directors' and officers' liability (collectively, the "Insurance Policies"). The Insurance Policies are essential to the preservation of the value of the Debtors' business, property and assets. In many cases, insurance coverage such as that provided by the Insurance Policies is required by the diverse regulations, laws and contracts that govern the Debtors' commercial activities. Further, I understand that the Guidelines of the Office of the United States Trustee for the District of Delaware require debtors to maintain insurance coverage throughout their chapter 11 proceedings.

48.     The Debtors believe that the ordinary course maintenance of its insurance financing programs, including payment of all monthly obligations under the Premium Financing Agreements, and the renewal of or entry into new financing arrangements as may be required as the annual terms of existing arrangements expire, without further order of the Court, is necessary and essential to the Debtors' business operations during the bankruptcy and sale process.  In fact, the Debtors' failure to pay their monthly premium obligations to the Premium Financing Companies could have serious consequences for the Debtors' business operations.

49.     Specifically, under the terms of the Premium Financing Agreements, the Premium Financing Companies may have the right to cancel the Insurance Policies for nonpayment and/or accelerate and declare due and payable the entire unpaid premiums upon the Debtors' failure to pay the monthly premium obligations.  Because the Debtors are required to maintain insurance coverage during their chapter 11 cases, the cancellation of the Insurance Policies would cause the Debtors to violate the U.S. Trustee's Operating Guidelines.

50.     I believe the authority to maintain the existing insurance policies and pay all of the premiums or continue insurance premium financing programs in accordance with the Debtor's prepetition business practices is in the best interest of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**Motion of Debtors Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code For An Order (I) Authorizing Payment Of Pre-Petition Wages, Compensation, Payroll Taxes, And Employee Benefits (II) Authorizing Debtors To Maintain Their Existing Employee Programs; And (III) Authorizing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations.**

51.     The Debtors request, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code that the Court authorize the Debtors to pay (a) in their sole discretion, (i) all obligations related to Wages, (ii) all Payroll Taxes related to the Wages, (iii) Expense Reimbursements to

employees for job related expenses, (iv) Employee Benefits, and (v) all costs with regard to services provided by their employees during the pre-petition period and (b) maintain and continue to honor their practices, programs, policies and benefit plans for their employees as they were in effect as of the Petition Date, and as such, may be modified, amended, or supplemented from time to time in the ordinary course.

52.     As of April 27, 2009, the Debtors employed approximately 125 individuals in the United States. Approximately 119 are located at the Debtors' Seagrove facility and approximately 6 are located at the Debtors' corporate headquarters in Dallas, Texas. The continued operation of the Debtors' business as a going concern pending sale of the Debtors' assets depends largely upon the retention of the services of these employees and the maintenance of employee morale and cooperation. Maintaining going concern value is critical to maximizing the value of the Debtors' assets. Consequently, it is critical that the Debtors be authorized to satisfy their employee related obligations and continue their ordinary course employee plans, policies, and programs in effect as of the Petition Date.

53.     Accordingly, I believe that the authority to pay all employee obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal employees will seek other employment alternatives.

### Debtors' Motion For Order Pursuant To Sections 105(A) And 363(B) Of The Bankruptcy Code For Authorization To Pay Certain Prepetition Taxes And Fees.

54.     By this Motion, the Debtors seek entry of an order authorizing the Debtors, to pay pre-petition sales, use, franchise and other tax obligations and local regulatory fees to various state and

local taxing authorities, including those taxes and fees subsequently determined upon audit, or otherwise, to be owed for periods prior to the Petition Date, and including any penalties and interest thereon.

55. Payment of the prepetition sales and use taxes is critical to the Debtors' continued, uninterrupted operations. Nonpayment of these obligations may cause taxing authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

56. Accordingly, I believe that the authority to pay the taxing authorities in accordance with the Debtors' prepetition business practices is in the best interest of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

### Debtors' Motion Pursuant To Sections 105, 363, 364, and 1107 Of The Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for Authorization To Pay The Pre-Petition Claims Of Certain Critical Providers.

57. The Debtors seek entry of an Order authorizing them pursuant to sections 105, 363, 364, And 1107 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, to pay certain pre-petition claims, consisting of (I) the pre-petition fixed, liquidated, and undisputed claims of certain of the Debtors' critical suppliers and vendors of supplies, material, and services, and (II) other critical pre-petition claims, including without limitation, common carriers, delivery services, IT services, tooling services and insurance carriers.

58. The ability of the Debtors to continue their operations on a going concern basis will depend largely upon uninterrupted, continued access to the products and services provided by the Critical Providers. At this critical stage, an interruption in the provision of such products and services by the Critical Providers would be severely detrimental to the Debtors' efforts to sell their assets as a going concern, and would significantly impair the value of the Debtors' estates.

59. To satisfy the Critical Prepetition Claims, the Debtors seek an order authorizing, but not obligating, them to pay, in their sole discretion, up to $200,000 in cash or in kind (at the Debtors' election).

60. I believe that the harm and economic disadvantage that would stem from the failure to pay the Critical Providers is grossly disproportionate to the amount of the Critical Pre-Petition Claims that would have to be paid to ensure that the Critical Providers continue to conduct business with the Debtors. Accordingly, I believe that the payment of the prepetition claims of certain critical providers is in the best interest of the Debtors' and their estates and should be granted in all respects.

**Motion Of Debtors Pursuant To Sections 105(A) And 366 Of The Bankruptcy Code For Order (I) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Service, (II) Deeming Utilities Adequately Assured Of Future Payment, and (III) Establishing Procedures For Determining Adequate Assurance Of Payment.**

61. The Debtors seek entry of an Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (i) prohibiting the Utility Companies from discontinuing, altering or refusing service to the Debtors; (ii) deeming the Utility Companies to be adequately assured of payment on the basis of the Proposed Adequate Assurance; and (iii) establishing procedures for resolving requests for additional assurance of payment.

62. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' efforts to sell their businesses as a

going concern. The Debtors utilize the services of approximately ten (10) Utility Companies in the operation of their businesses. If one or more of the Utility Companies refused to provide or discontinued services even for a brief period, the Debtors' operations would be severely disrupted.

63.     The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner. As adequate assurance of the future performance, the Debtors propose to provide a deposit within ten (10) business days of the first day hearing to each Utility Company, excluding De Minimis Providers equal to the cost of one-half month of such Utility Company's average monthly service, calculated as a historical average over the past twelve months; except that such Utility Company is not currently paid in advance for its services. The Debtors also propose a procedure by which utilities can request additional adequate assurance.

**Debtors' Motion Pursuant To Sections 361, 362, 363 and 507 of the Bankruptcy Code and Bankruptcy Rule 4001 for an Order: (1) Authorizing Use Of Cash Collateral; (2) Granting Adequate Protection Liens and Administrative Claims; (3) Scheduling and Approving the Form and Method of Notice For A Subsequent Hearing; and (4) Granting Related Relief**

64.     The Debtors request (a) pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, (i) authority to use cash collateral pursuant to section 363 of the Bankruptcy Code and (ii) authority to grant the Debtors' prepetition secured lenders adequate protection; and (b) the scheduling of a final hearing on the motion.

65.     The Debtors believe that substantially all of the cash generated by the Debtors business operations constitute the cash collateral of the Senior Lenders and/or the Subordinate Lenders. The Debtors have requested that the Court authorize their use of Cash Collateral in the amount of and for the purposes set forth in the Budget, which may be supplemented or extended upon the express written agreement of the Agent.

66.     The Debtors have an immediate need to obtain use of the Cash Collateral for, among other things, the continuation of their business operations, the preservation and orderly disposition of their businesses and assets as a going concern, and the orderly administration of their estates. Without the use of Cash Collateral, the Debtors will be unable to pay necessary expenses. The ability of the Debtors to obtain liquidity through the use of the Cash Collateral is vital to the Debtors efforts to maximize the value of their assets. Without this relief, the Debtors will be forced to shut down immediately, causing immediate and irreparable harm.

67.     Because the Debtors would have no alternative other than to shut down immediately without the authority to use Cash Collateral, I believe that granting the Debtors authority to use cash collateral is in the best interest of the Debtors, their estates, and their creditors.

### Conclusion

68.     Based on the foregoing, I believe the approval of First Day Orders is in the best interests of all stakeholders.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 27, 2010

_____
Jeffrey C. Merritt

# Exhibit A

# Moll Corporate Structure

(as of 10/10/2008)

**Board:**
Pat Daugherty (Chairman)
Charles McQuery
Kevin Andrews
Tom Pereira

**Officers:**
Kevin Andrews, Chief Executive Officer and President
Jim Campbell, Chief Financial Officer and Secretary
Juan Resendez, Chief Operating Officer
Keith Dunlap, Vice President of Sales and Marketing

## Moll Holdings, Inc.
(Delaware)

Sole Member

Sole Shareholder

Sole Member

## Moll Latin America Holdings, LLC
(Delaware)

## Moll Industries, Inc.
(Delaware)

## Moll Europe Holdings, LLC
(Delaware)

50% Owner

## Moll Mexico, S.De.R.L. De D.V.
(Mexico)

50% Owner

50% Owner

50% Owner

## Moll Mexico Speciality, S.De.R.L. De C.V.
(Mexico)

Sole Shareholder

## InteSys Ireland Limited
(Ireland)

AUS.608642.1